```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                         17-MJ-769(AMD)
 3   UNITED STATES OF AMERICA,
                                         United States Courthouse
 4                                       Brooklyn, New York

 5          -against-                    April 23, 2018
                                         10:00 a.m.
 6   RASHEEDUL MOWLA,

 7          Defendant.

 8   ------------------------------x

 9            TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
                BEFORE THE HONORABLE ANN M. DONNELLY
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES

12   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
13                              271 Cadman Plaza East
                                Brooklyn, New York 11201
14                              BY:  CRAIG HEEREN, ESQ.
                                     MARGARET LEE, ESQ.
15                              Assistant United States Attorneys

16   For the Defendant:         STEVE ZISSOU & ASSOCIATES
                                42-40 Bell Boulevard
17                              Bayside, New York 11361
                                BY:  STEVE ZISSOU, ESQ.
18

19   Court Reporter:            Rivka Teich, CSR, RPR, RMR, FCRR
                                Phone:  718-613-2268
20                              Email:  RivkaTeich@gmail.com

21   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
22

23

24

25
```

Hearing

1              (In open court.)

2              COURTROOM DEPUTY:  All Rise.  Criminal cause for a

3     hearing.  Docket number 17-MJ-769, United States versus

4     Rasheedul Mowla.

5              Counsel state your appearance, Government first.

6              MR. HEEREN:  Craig Heeren on behalf of the United

7     States.  With me is my colleague Maggie Lee.  Good morning,

8     your Honor.

9              THE COURT:  Hello.

10              MR. ZISSOU:  Steve Zissou for Mr. Mowla.  And I'm

11     joined by third-year law student Sidney Speller.

12              THE COURT:  Good morning.  And good morning,

13     Mr. Mowla.

14              We're here for a hearing just on a question of

15     Mr. Mowla's competency; is that right, to stand trial?

16              MR. HEEREN:  Yes, your Honor.

17              THE COURT:  Are you ready to call your first

18     witness?

19              MR. HEEREN:  Yes, your Honor.  The Government calls

20     Dr. Samantha DiMisa.

21              (Witness takes the witness stand.)

22     SAMANTHA DIMISA, called as a witness, having been first duly

23     sworn/affirmed, was examined and testified as follows:

24              THE WITNESS:  Yes.

25              COURTROOM DEPUTY:  State and spell your name.

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1          THE WITNESS:  Dr. Samantha S-A-M-A-N-T-H-A, D-I,

2     capital M-I-S-A.

3          COURTROOM DEPUTY:  Have a seat.

4          THE COURT:  Okay, Doctor, just a couple of things.

5     I'm going to ask that you not speak too quickly, I want to

6     make sure the court reporter can take down everything that you

7     have to say.  And just wait until whichever lawyer is asking

8     you questions, wait until the person finishes talking before

9     you start talking so we're not talking over one another.  If

10    there is something that isn't clear or you need to have

11    repeated let us know, okay?

12         THE WITNESS:  Thank you.

13         THE COURT:  Go ahead.

14    DIRECT EXAMINATION

15    BY MR. HEEREN:

16    Q    Good morning.

17    A    Good morning.

18    Q    Could you please provide us with your title and where you

19    work?

20    A    I'm a forensic psychologist at Metropolitan Correctional

21    Center in New York.

22    Q    And can you please tell us what a forensic psychologist

23    is?

24    A    A forensic psychologist conducts mental health

25    evaluation, such as competency to stand trial, criminal

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1   responsibility, as well as risk assessments.

2   Q    If you can go back a hair from the mic.  That's great.

3        Who do you work for?

4   A    I work for the Metropolitan Correctional Center in New

5   York, as well as for the United States Public Health Service.

6   Q    Can you tell -- is the United States Public Health

7   Service known as USPHS?

8   A    Yes.

9   Q    Tell us what that is.

10  A    The USPHS is an organization that supports the needs of

11  individuals in the country and nationally for manmade or

12  domestic events, such as hurricanes or any terroristic

13  attacks, where we respond as a psychologist to provide mental

14  health treatment.  There are various other disciplines within

15  the United States Public Health Service that also offer

16  assistance.

17  Q    So to be clear, at this time are you employed by the

18  Bureau of Prisons or the USPHS?

19  A    I'm employed by the USPHS and my duty station is the

20  Federal Bureau of Prisons.

21  Q    How long have you worked at your current facility, the

22  Metropolitan Correctional Center?

23  A    I began working at the Metropolitan Correctional Center

24  in January 2014.

25  Q    Did you work anywhere else before that?

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1    A    I did not work anywhere else, but I did have prior

2    placements for both internship as well as post-doctoral

3    fellowship.

4    Q    Where?

5    A    At the Fellow Medical Center in Butner North Carolina and

6    post-doctoral in forensic psychology at the University of

7    Massachusetts Medical School.

8    Q    I think we covered this a bit, can you describe a little

9    more about any of your relevant education, accreditations and

10   specialized training?

11   A    I completed my PhD in clinical psychology in Hofstra

12   University in 2012.  I completed a forensic psychology

13   externship at the Metropolitan Correctional Center in New

14   York.

15   Q    Do you receive continuing training?

16   A    Yes, I do.

17   Q    Now, as we get further into this, if I make any mistakes

18   as to the proper terminology, please let me know and correct

19   me.  Do you understand that?

20   A    Yes.

21   Q    Can you describe -- are you able to diagnose in your

22   position as a forensic psychologist, psychological and medical

23   or psychological medical conditions?

24   A    I'm able to diagnose psychological disorders.

25   Q    Does that include psychotic disorders like schizophrenia?

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1  A    Yes, it does.

2  Q    Can you briefly describe the difference between a

3  psychologist and psychiatrist?

4  A    A psychologist attends graduate school; whereas, a

5  psychiatrist attends medical school.  So the main difference

6  between the two professions is that a psychiatrist prescribes

7  medications; whereas, a psychologist does not.  A psychologist

8  provides psycho therapy as well as mental health evaluations.

9  A psychiatrist can also do that, but they prescribe medication

10  as well.

11  Q    Can you tell us what is the job responsibilities of, in

12  particular, of a forensic psychologist.

13  A    A forensic psychologist evaluates and looks at the

14  intersection of psychology and law pertaining to questions

15  related to competency to stand trial, criminal responsibility,

16  risk assessments, and treatment recommendations.

17  Q    So is one of your job responsibilities to perform

18  competency evaluations?

19  A    Yes.

20  Q    Can you estimate how many times you've performed a

21  competency evaluation in your career?

22  A    In my career at the Metropolitan Correctional Center in

23  New York I've completed approximately 85 competency to stand

24  trial evaluations.  There have been more in my training, but

25  in a position as a forensic psychologist, it has been 85.

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1   Q    So 85 that you did yourself, and a number of others that

2   you participated in as an intern?

3   A    As well as an extern, that's correct, yes.

4   Q    Thank you.  Have you found individuals competent to stand

5   trial?

6   A    Yes, I have.

7   Q    Have you found individuals not competent to stand trial?

8   A    Yes.

9   Q    Have you previously testified as to competency?

10  A    Yes, I have.

11  Q    Do you recall approximately how many times before you've

12  testified?

13  A    Approximately 20 times before.

14  Q    Have you previously been qualified as an expert as a

15  forensic psychologist?

16  A    Yes, I have.

17  Q    Approximately how many times?

18  A    Each time that I testified I was qualified as an expert.

19         MR. HEEREN:  Your Honor, at this time the Government

20  would move to qualify the witness as an expert in the field of

21  forensic psychology.

22         THE COURT:  Any objection?

23         MR. ZISSOU:  I object to the general classification.

24  If he's asking if she's qualified to do competency

25  examinations, I have no objection.  If he's asking whether or

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1  not she's an expert in diagnosing schizophrenia, there is

2  no --

3            THE COURT:  I don't think that's the purpose of this

4  hearing.  So you're objecting to her qualifications as a

5  forensic psychologist?

6            MR. ZISSOU:  If he's asking her to be qualified as

7  an expert in determining competency, I have no objection.  But

8  the broader term encompasses a great many things.

9            THE COURT:  I'm going to cut this short.  I don't

10  know if it's relevant or not, but she's clearly qualified as a

11  forensic psychologist and all the things that that entertains.

12  I find her competent to testify in that field.

13            Just one question, just in case it's not clear, have

14  you testified to things in addition to competency evaluations?

15            THE WITNESS:  Yes, I have.  I've also testified to

16  the issue of criminal responsibility, as well as the Section

17  15, which is related to Massachusetts state law for the

18  involuntary commitment of individuals with substance abuse.

19            MR. ZISSOU:  May I have a voir dire?

20            THE COURT:  I think all we're talking about is

21  competency, am I right about that?

22            MR. HEEREN:  Your Honor, I expect defense counsel to

23  ask a number of questions about her diagnosis that he's not

24  schizophrenic so...

25            THE COURT:  You want to voir dire her then?

SAMANTHA DIMISA – VOIR DIRE – MR. ZISSOU

1          MR. ZISSOU:  Well --

2          THE COURT:  If you want to do it, you can.  Or you

3  can cross examine her on the topic.  There doesn't seem to be

4  a question that she's an expert in the field of forensic

5  psychology.

6          MR. ZISSOU:  I have my opinions.

7          THE COURT:  So voir dire her.

8          MR. ZISSOU:  I guess my question is, is the Court

9  going to limit us to just questions of competency?  If

10 that's --

11         THE COURT:  No.

12         MR. ZISSOU:  All right, so then can I have a few

13 minutes, Judge?

14         THE COURT:  Sure.

15 VOIR DIRE

16 BY MR. ZISSOU:

17 Q    Dr. DiMisa, you were asked by the Court, I think the

18 Court, for you to prepare a competency examination of

19 Mr. Mowla in this case; is that right?

20 A    Yes.

21 Q    You did that?

22 A    Yes.

23 Q    You spent about three hours or so with him over a period

24 of time and made several observations among other things,

25 correct?

SAMANTHA DIMISA – VOIR DIRE – MR. ZISSOU

1  A    Yes, I did.

2  Q    As part of your report, you also drew a conclusion about

3  whether or not he suffers from any mental disease such as

4  schizophrenia; isn't that right?

5  A    Yes.

6  Q    How did you come to make the decision to do that, if I

7  might ask?

8        THE COURT:  The only -- I'm not trying to cut you

9  off.  We're just going to her qualifications in this area.  It

10  sounds to me a little like cross-examination.  It's just we're

11  not quite at that stage of the hearing.

12        MR. ZISSOU:  I get that.

13        THE COURT:  It's not your turn.  But you want to

14  answer that question, all right.

15  A    I considered various data points, such as prior mental

16  health records, my observations, as well as staff's

17  observations at the Federal Bureau of Prisons.  As well as

18  collateral contact with family and my interviews and tests of

19  the defendant.

20  Q    You consider a number of things.  The question was, how

21  did you come to decide, to include in the competency

22  examination, a discussion of schizophrenia or whether or not

23  Mr. Mowla is suffering from it?  How did -- is that standard?

24  Did someone tell you to do it, that's the question?

25  A    Yes, it is standard that we provide a diagnostic

SAMANTHA DIMISA – VOIR DIRE – MR. ZISSOU

1  analysis.  I also had a differential diagnosis where I

2  considered other diagnoses rather than the one I offered.

3  Q    Have you ever treated anyone with schizophrenia?

4  A    Yes, I have.

5  Q    Have you every examined someone who actually had

6  schizophrenia?

7  A    Yes.

8  Q    About how many times have you treated somebody who had

9  schizophrenia?

10  A    It's difficult for me to say a number, I would say maybe

11  one out of five cases I work on meets criteria of a diagnosis

12  of schizophrenia.

13  Q    One of five while you've been at the MCC?

14  A    In my career, including my other training.

15  Q    Insofar as your other training, what training did you

16  receive in the identification of people suffering from

17  schizophrenia and related schizophrenia-like ailments?

18  A    During my doctoral training at Hofstra we take a

19  diagnostics and psychopathology course in child and adult

20  psycho-pathology.  We're trained by supervisors on placements,

21  externship, internship, and post-doctoral fellowship regarding

22  diagnostic criteria.

23  Q    Looking at your resume here, and I going back through the

24  original clinical training, in May of 2010 and June 2008 you

25  participated in child and patient psychological services

SAMANTHA DIMISA – VOIR DIRE – MR. ZISSOU

1   clinic; is that right?

2   A     Yes.

3   Q     Folks had schizophrenia at that clinic?

4   A     No.

5   Q     The same year you were a psychological examiner at a

6   training that was conducted at Hofstra, right?

7   A     Yes.

8   Q     Any folks with schizophrenia there?

9   A     It's an out-patient clinic so, no.

10  Q     2009 you were a psychology rehab counselor extern

11  program, any folks with schizophrenia there?

12          MR. HEEREN:  Your Honor, I'm happy to give defense

13  counsel latitude there, but I think she answered the primary

14  question, which is, has she treated and diagnosed people with

15  schizophrenia before.  She answered yes, and provided an

16  estimated number on this.

17          I don't see the value on voir dire going through

18  each and every single instance of her career on this.

19          THE COURT:  You can ask a few more questions, but go

20  ahead.

21  BY MR. ZISSOU:

22  Q     How about the extern therapist in anxiety and depression

23  program, folks with schizophrenia there?

24  A     No, mostly treating those with anxiety and depression.

25  Q     The last one is extern therapist in marriage and family

SAMANTHA DIMISA – VOIR DIRE – MR. ZISSOU

1  therapy clinic?

2          THE COURT:  I'm going to go out on a limb and say

3  probably not.

4  A    That's correct.

5  Q    And could you tell us if you would, based on your

6  experience and training, are there training that folks in your

7  position generally use to determine whether or not folks

8  suffer from schizophrenia?

9  A    We use the Diagnostic and Statistical Manual, the Fifth

10  Version.  We also can administer testing as well.

11  Q    Could you just tell us whether it's, according to the

12  DSM5 or some other understanding that you have, what kind of

13  tests do folks in your position give to determine if somebody

14  has schizophrenia?

15  A    Mostly we're relying on the diagnostic criteria that's

16  within the DSM5.  There are clinics that do administer the

17  SCID, which is an evaluation that's used to assess for

18  psychopathology.  There are a host of malingering tests that

19  we use when we have a question about the feigning of

20  psycho-psychology.

21  Q    What are the standards in DSM5?

22          THE COURT:  This sounds like cross-examination.  If

23  you have an objection to her qualification as a forensic

24  psychologist, you can make them.  But you're really

25  cross-examining her on the tests she does on the subject.

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1      MR. ZISSOU:  I haven't gotten to that, but I want to

2  know if she knows.  I do object to her being qualified.

3      THE COURT:  I think I get the point of it.  If

4  something about your cross changes my mind about it, but I'm

5  going to overrule your objection and find that she is an

6  expert in the area of forensic psychology.

7      MR. HEEREN:  Thank you, your Honor.

8  DIRECT EXAMINATION

9  BY MR. HEEREN:

10 Q   I just want to pick up on one last point.  You mentioned

11 the use of the DSM manual number five?

12 A   Yes.

13 Q   You described using that to do a diagnoses, is that

14 referred to as differential diagnoses?

15 A   A differential diagnoses is when there is potentially two

16 or more diagnoses that you're deciding between, and there are

17 diagnostic criteria offered in the DSM5 that we go by to

18 determine one diagnosis.

19 Q   So is the use of the diagnostic criteria in DSM5, is that

20 a recognized and appropriate way to make a diagnosis of a

21 patient?

22 A   Yes, it is.

23 Q   What is a competency evaluation?

24 A   A competency to stand trial evaluation evaluates the

25 defendant's factual and rational understanding of the

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1  proceedings against him or her, taking into account their

2  understanding of the courtroom procedures, courtroom personnel

3  and their roles, as well as their ability to understand the

4  charges that are against them.

5  Q    How do you perform this evaluation?

6  A    In performing a competency to stand trial evaluation, I

7  conduct a clinical interview to assess a comprehensive

8  background of the defendant.  I also request medical records

9  and reach out to collateral sources, such as family or friends

10  in the community.  I conduct a competency-related

11  questionnaire to assess their competency-related abilities.  I

12  also conduct a mental status examination, as well as various

13  psychological testing that is appropriate to the referral.

14  Q    Now ordinarily how long in total time does this process

15  last?

16  A    Competency to stand trial evaluations are 30 days long

17  with the ability to request an additional 15 days per statute

18  if needed.

19  Q    During those 30 days, can you say approximately how much

20  time in an ordinary case you would spend directly examining or

21  interviewing the individual involved?

22  A    I typically spend approximately eight hours interviewing

23  defendants for competency to stand trial.

24  Q    Now, a bit more practically or logistically, an

25  individual who has had a competency evaluation ordered who is

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1   in custody, are they placed in a psychological wing, for

2   example, at the MCC?

3   A    No, they are not.  We do not have a mental health area

4   with the exception of suicide watch or psychological

5   observation.  If the individual is not experiencing any acute

6   psychopathology, such that he or she would need that

7   placement, they are placed in general population.

8   Q    However, during that 30-day period do you have the

9   opportunity to do more informal observation of the individual?

10  A    Yes, I do.  By entering onto the housing unit where the

11  individual is housed or by speaking to other staff, such as

12  medical staff or custody staff that interact with the

13  defendant.

14  Q    Do you also, as part of the evaluation -- and I apologize

15  if you said this and I missed it -- do you also review or

16  consider the relationships of the individual with other

17  individuals in their housing unit?

18  A    I do take that into consideration.  Although, I value the

19  opinion of staff a bit more than inmate peers.

20  Q    In the past have you in other circumstances have you had

21  an experience where staff or other inmates have provided you

22  with information relevant to a competency evaluation?

23  A    I would say more related to staff opinions; but yes,

24  there are indications in evaluations for better or worse when

25  inmates do confront me regarding the behavior of the

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1   defendant.

2   Q    Do you document that information if you receive it?

3   A    Yes.

4   Q    At the conclusion of a competency evaluation, do you

5   reach a conclusion about competency one way or the other,

6   competent or incompetent?

7   A    I do offer an opinion regarding competency, yes.

8   Q    If you don't, do you request more time?

9   A    Yes, I would request an additional extension.  But there

10  is on each case I worked I have offered an opinion.

11  Q    If you think it's appropriate for a particular defendant

12  to receive further examination by another type of doctor or

13  medication, can you do anything about that?

14  A    Yes.  I can refer the defendant to the psychiatrist at

15  the prison.  I can also recommend at the end of the report

16  that the individual be sent for competency restoration to an

17  in-patient federal medical center such as in Butner, North

18  Carolina.

19  Q    What is -- you said earlier you're familiar with

20  schizophrenia?

21  A    Yes.

22  Q    How would you describe schizophrenia?

23  A    Schizophrenia is a psychotic-based spectrum disorder

24  where there are both negative and positive symptoms.

25         Positive symptoms can be auditory hallucinations or

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1   delusions.  Positive meaning there is an addition of some type

2   of symptom.

3          Whereas negative symptoms are the substruction of

4   organized thought or social relatedness that the individual

5   has with others, or the ability to care for him or herself in

6   terms of their activities of daily living, such as showering.

7   Q    You previously described what you're looking for in a

8   competency evaluation, the ability for the person to

9   adequately participate in the trial process.  So based on

10  that, can someone who is schizophrenic be competent to stand

11  trial in your opinion?

12  A    Yes.

13  Q    Why is that?

14  A    If the individual is successfully treated with an

15  anti-psychotic medication and they are not presenting with any

16  deficits in their factual or rationale understanding, I would

17  offer the opinion that he or she would be competent to stand

18  trial.

19  Q    Now are you familiar with an individual named Rasheedul

20  Mowla?

21  A    Yes, I am.

22  Q    You were asked to evaluate his competency?

23  A    Yes, I was.

24  Q    I'd like to show you a document I believe it should come

25  up on your screen marked as Government's Exhibit one for

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1    identification.  It's a multi-page document, I believe

2    approximately 17 pages long.  I'm going to point you to the

3    first page, then the last page, and represent to you that this

4    is the complete document.  Just for convenience sake, as I

5    think about it, I'm going to give you a paper copy.

6              May a approach, your Honor?

7              THE COURT:  Yes, go ahead.

8    Q    Have you had a chance to look at this document?

9    A    Yes, I have.

10   Q    What is this?

11   A    This is the competency to stand trial evaluation that I

12   submitted dated February 7, 2018.

13   Q    Do you know for what defendant?

14   A    For Mr. Rasheedul Mowla.

15   Q    How do you know that this is the competency evaluation

16   that you prepared for the defendant in this case?

17   A    By looking at page 17 my signature is there, as well as

18   the chief psychologist, Dr. Alisa Miller.  Looking through the

19   various pages of the report I recognize it as my report.

20             MR. HEEREN:  At this time I move to admit

21   Government's Exhibit one into evidence.

22             MR. ZISSOU:  No objection.

23             THE COURT:  Government's Exhibit one is in evidence.

24             (Government Exhibit 1, was received in evidence.)

25   BY MR. HEEREN:

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1    Q    As part of the competency evaluation of the defendant,

2    did you interview him?

3    A    Yes, I did, on approximately nine occasions for

4    approximately three hours.

5            THE COURT:  No total, or each?

6            THE WITNESS:  I'm sorry.  Three hours total during

7    the evaluation period.

8            THE COURT:  Okay.

9    BY MR. HEEREN:

10   Q    We'll get into this more later, but is there a reason why

11   the evaluation lasted roughly three hours in total?

12   A    I should also mention that I did conduct psychological

13   testing, which are not included in the three hours, so it's a

14   little more.  But my interviews were only three hours long due

15   to the defendant's unwillingness to cooperate with the

16   interviews.

17   Q    I see.  So when you say three hours, that's actually

18   three hours of time of direct interviews with the defendant?

19   A    Yes.

20   Q    You just mentioned testing, so you performed testing of

21   the defendant as well?

22   A    Yes, I did.

23   Q    They are summarized in your report, can you describe some

24   of the testing that you performed?

25   A    I administered five psychological tests.  One the

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1   Minnesota Multiphasic Personality Inventory, second addition

2   revised form abbreviated MMPI-2- RF.  It is a personality

3   measure where we look at one's psychological adjustments as

4   well as any response by us.

5           I also administered the Validity Indicator Profile,

6   abbreviated VIP.  It's a measure that looked at both effort

7   and motivation.

8           In addition to that, I administered the Shipley-2,

9   that's S-H-I-P-L-E-Y, dash, two.  And it's a measure of

10  cognitive functioning, assessing both verbal and non-verbal

11  cognitive functioning.

12          I also administered the Miller Forensic Assessment

13  Screening Tool, abbreviated M-FAST.  It's a measure used to

14  assess for any feigning of psychopathology.

15          THE COURT:  Like pretending.

16          THE WITNESS:  F-E-I-G-N-I-N-G.

17  A    Either exaggeration or faking of mental health symptoms.

18          Lastly, I administered the Test Of Memory

19  Malingering, which is abbreviated TOMM.  And it assesses for

20  memory functioning and any feigning of memory deficits.

21  Q    Did you also conduct a background investigation and

22  interviews related to the defendant?

23  A    Yes.  I performed a clinical interview assessing

24  Mr. Mowla's developmental history, educational history,

25  marital history, psychiatric history, medical history, and

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1   substance abuse history.

2   Q    Did you interview any other individuals?

3   A    I did interview Mr. Mowla's father on the telephone.

4   Q    Did you speak to counsel involved in this case?

5   A    Yes, I did.

6   Q    Both for the Government and the defendant's attorney?

7   A    Yes.

8   Q    Were you able to talk to any other family members of the

9   defendant?

10  A    No, I was not able to.

11  Q    Why not?

12  A    I did call the second number that I was provided, it was

13  Mr. Mowla's father who answered.  I was trying to reach his

14  sister and I was advised by his father that his sister was

15  away at college.

16  Q    Did you review any of the defendant's prior medical

17  records?

18  A    I reviewed prior mental health records.  There were prior

19  medical records that are provided in the Borough Electronic

20  Medical Record, abbreviated BEMR.

21  Q    Do you recall where the defendant's mental health records

22  were from?

23  A    Yes.  They were from the New York University Hospital, as

24  well as a letter from the Jamaica Hospital mental health

25  out-patient clinic.

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1  Q    Were you able to review, at the time of your competency

2  evaluation, were you able to review the medical records from

3  the Jamaica Hospital out-patient clinic?

4  A    No, I was not.

5  Q    Why not?

6  A    I did not receive a copy of those records.  The records

7  that I did receive were from attorney Zissou on behalf of the

8  defendant.  The defendant declined to sign a consent to

9  release information such that I was not able to request mental

10  health or medical records.

11  Q    To be clear, you did receive a letter from the doctor

12  responsible for the defendant at Jamaica Hospital?

13  A    Yes, I did.

14  Q    Did that letter provide any sort of summary of the

15  treatment he received?

16  A    Yes.

17  Q    Did you consider that in your report as well?

18  A    I did.

19  Q    Did you observe the defendant's interactions or

20  communications with other individuals?

21  A    I did not directly observe him interacting with others.

22  However, I did speak to a custody officer as well as reviewed

23  various medical notes from medical personnel, including the

24  psychiatrist who did evaluate Mr. Mowla.

25  Q    Did you observe or review any written communications by

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1  the defendant with any other people or any other telephone

2  calls with the defendant with any other people?

3  A    I believe I attempted to review the telephone calls.  I

4  do not believe they were in English.  But the writings -- no,

5  I did not have any writings that were provided by the

6  defendant.

7  Q    What about e-mail communications?

8  A    Yes -- I apologize, yes.  I did review e-mail

9  correspondence that the individual had with his attorney.

10 Q    Did you ever observe the defendant interacting with his

11 father or any other family members either on the phone or

12 otherwise?

13 A    I do not believe so.

14 Q    You were able to complete all of the testing that you

15 wanted to complete on the defendant?

16 A    I administered all the testing I wanted to complete.

17 However, I was not able to finish the administration of one of

18 the measures.  And there was a second measure that Mr. Mowla

19 did not endorse enough items, such that it was deemed

20 unscoreable.

21 Q    Can you clarify which one you did not complete, which was

22 unscoreable?

23 A    The measure that was unscoreable was the MMPI-2-RF, which

24 assesses for personality, as well as response bias.  I was

25 unable to complete the administration of the TOMM due to

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1   Mr. Mowla eliciting reasons why he was unable to proceed.

2   Q     Is that the instance that you described in your report

3   where he leaves and ultimately does not return to your office?

4   A     Yes.

5   Q     Did you reach a competency determination about the

6   defendant?

7   A     Yes, I did offer an opinion.

8   Q     What was your opinion?

9   A     My opinion is that Mr. Mowla does exhibit the necessary

10  competency related abilities.

11  Q     Did you also offer a -- which you identified as a

12  rule-out diagnosis?

13  A     Yes.

14  Q     What is a rule-out diagnosis?

15  A     A rule-out diagnosis is when there is uncertainty

16  regarding the diagnosis or there is inconsistency in the data

17  that's provided, such that the diagnosis is offered with

18  caution or for future consideration in the event that one was

19  provided with more consistent data.

20  Q     In this case, can you summarize what was the

21  inconsistency or ambiguous data that you received such that

22  you felt it necessary to offer a rule-out diagnosis?

23  A     In an abundance of caution I offered the malingering

24  diagnosis as a rule-out due to the history that was presented

25  in the mental health records that I was provided from NYU.  In

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1   those records it did indicate that Mr. Mowla was previously

2   treated with an anti-psychotic medication; that being

3   Risperdal, first at 1 milligram and then titrated or increased

4   up to 3 milligrams where he did appear to respond well to

5   treatment with that medication.  With that information I did

6   want to consider a potential diagnosis of a psychotic spectrum

7   based disorder.  However, Mr. Mowla did not present with any

8   acute psychopathology during our meetings despite his

9   self-report of these symptoms.

10  Q    I think it's largely evident from your answer, but can

11  you briefly clarify what the term, the diagnosis, malingering

12  means?

13  A    Malingering diagnosis is a feigning or grossly

14  exaggerated presentation of psychopathology symptoms in an

15  effort for secondary gain, such as evading criminal

16  prosecution.

17  Q    What did you conclude as to his need for medication, or

18  was what was your opinion?

19  A    As a psychologist, again I do not prescribe medication;

20  however, I am able to refer defendants with whom I work with

21  to the psychiatrist.  My opinion was that Mr. Mowla did not

22  present with any acute psychopathology that would warrant

23  treatment with psychotropic medication.  However, I did make

24  multiple referrals to the staff psychiatrist at MCC New York.

25  Q    What was the result of those referrals?

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1   A   The staff psychiatrist had met with Mr. Mowla first at

2   MDC, the Metropolitan Detention Center in Brooklyn, New York.

3   At that time there was a rule-out of malingering diagnosis

4   offered by the psychiatrist.  No medication was prescribed.

5        When he was sent to us, at MCC New York, he was

6   again seen by the psychiatrist at my referral, as well as the

7   referral of the clinical director in medical services.  The

8   staff psychiatrist, who is the same psychiatrist who saw

9   Mr. Mowla at MDC Brooklyn, again opined that the individual

10  was not presenting with any acute psychopathology, offered a

11  diagnosis of malingering, and did not prescribe any

12  medication.

13       In addition to that, Mr. Mowla did express to me on

14  multiple occasions that he wanted psychotropic medication.  He

15  also communicated that to his defense counsel by e-mail.

16       I do take the needs of the patients I treat very

17  seriously, so I again referred him to Dr. Okafor, the staff

18  psychiatrist, who did meet with the patient a second time at

19  MCC New York, and again said the patient did not require any

20  treatment with psychotropic medication.

21  Q   Now, your evaluation of the defendant, your opinions, are

22  based on the information you received at that time; is that

23  right?

24  A   Yes, and I also consider any historical documents.

25  Q   What I mean to say, the diagnosis that you provided,

SAMANTHA DIMISA − DIRECT − MR. HEEREN

1   that's your diagnosis of him at the time of your evaluation;

2   in other words, in February of this year?

3   A    Yes, that's correct.

4   Q    But of course, as you just indicated, you considered

5   historical diagnoses?

6   A    Yes.

7   Q    In addition to the items you already identified, can you

8   provide us the other reasons why you concluded, why you

9   offered, an opinion of malingering?

10  A    Regarding the rule−out diagnosis of malingering that I

11  offered, I took several data points into consideration.  One

12  being the very vague account that Mr. Mowla gave of his

13  experience of auditor and visual hallucinations.  He often

14  times declined to talk about the specifics of the

15  hallucinations that he was reportedly experiencing.

16          I also administered several malingering−based tests.

17  One being the M−FAST, which I mentioned previously, which is

18  assessed for any feigned psychopathology.  On that measure

19  Mr. Mowla did have an elevated score.

20          His observed behaviors in comparison to the reported

21  behaviors were inconsistent, meaning that he would report

22  experiencing something but it was not observed in his behavior

23  during my administration of the test.

24          In addition to that, he endorsed several symptoms

25  that were of a severity and pervasiveness that is not typical.

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1          He also presented a symptom combination which is

2    rarely, if ever, seen together in bona fide psychiatric

3    spectrum based disorders.

4          THE COURT:  What was that?  What was the

5    combination?

6          THE WITNESS:  It would be an example such as only on

7    every third Tuesday -- I'm not using an exact example for

8    copyright issues -- I experienced auditory hallucinations.

9    And I only experienced that when I'm hungry.

10          So it's very bizarre, unusual symptom combination

11   that you would not typically see in somebody with true

12   schizophrenia or psychotic disorder.

13   Q    So I'd like to have you elaborate on that for a moment.

14   You referred to positive and negative signs of schizophrenia

15   earlier, do you recall that?

16   A    Yes.

17   Q    Can you provide us some examples of what you've

18   experienced as clinical examples or true examples of positive

19   signs of a person with schizophrenia?

20   A    So positive symptoms that I've observed in somebody

21   suffering from schizophrenia is talking to unseen others,

22   where they appear to be in conversation with people who are

23   not in the room, they are responding to auditory

24   hallucinations or voices that others do not hear.  They may

25   also appear to be seeing things, which are referred to as

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1    visual hallucinations, significantly less common than auditory

2    hallucinations.

3    Q    How would you characterize how symptoms impact a person's

4    day to day activity or interactions with others?

5    A    Positive symptoms of schizophrenia significantly impact

6    one's functioning.  It's very difficult for them to

7    concentrate and to pay attention to the task at hand.  They

8    are distractible.  They are often irritable.  It's difficult

9    to engage them in any social-appropriate conversation.

10   Q    Did you observe those issues with the defendant in your

11   experience?

12   A    No, I did not.

13   Q    Can you elaborate on negative symptoms?

14   A    Negative symptoms are the substraction of behaviors where

15   you may see a substraction in their emotion at or their

16   ability for social reciprocity or engage appropriately in

17   interpersonal functions.

18          In addition to substraction of activities of daily

19   lives where the individual is not bathing, or they are not

20   attending to their hygiene or eating appropriately.

21   Q    I take it that in your experience schizophrenia similarly

22   have a significant impact on the individual's day to day

23   activities?

24   A    Yes, it does.  Often times in those cases we do have to

25   house such individuals on psychological observation or suicide

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1   watch due to the risk in general population.

2   Q    Did you observe those negative symptoms in the defendant?

3   A    The only item that I observed in Mr. Mowla was a

4   flat-ended affect, which seemed to be consistent with prior

5   records, decreased eye contact, but I attributed that to his

6   lack of interest in cooperating with the forensic evaluation.

7   Q    You mentioned that he had an elevated score, the

8   defendant had an elevated score, on the test you had him take

9   for malingering?

10  A    Yes, on both the M-FAST as well as the TOMM.

11  Q    When you say elevated score, do you mean that it is

12  indicative of malingering?

13  A    It is a data point that needs to be considered for sure.

14  I take that into consideration as well as other information

15  that I'm provided, but certainly with an elevated score on the

16  M-FAST you're considered that there is malingering there that

17  is happening.

18  Q    I want to make sure elevated means more likely as opposed

19  to less likely?

20  A    Yes.

21  Q    Did you observe anything else about the defendant's

22  interactions that indicated, that supported, your diagnosis of

23  malingering in terms of his interactions with others?

24  A    According to a note written by the staff psychiatrist, he

25  did speak with the defendant's cell mate who indicated that

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1   Mr. Mowla was not presenting with any symptoms of

2   psychopathology.  As I mentioned before, we certainly take

3   into consideration that this is a self-report by an inmate and

4   not a staff member.

5   Q    Did any staff member provide you with any reporting that

6   was relevant to your evaluation?

7   A    On my last interview with Mr. Mowla, the custody officer

8   assigned to the housing unit did come into the office where I

9   was and told me that he would not be returning to complete the

10  testing administration.  So that was my only other verbal

11  interaction with staff regarding the defendant.

12  Q    So nobody, no staff at MCC came to you and described any

13  potential problems with the defendant?

14  A    No.

15  Q    What about -- did you interact -- you had an interview

16  with the defendant's father; is that right?

17  A    Yes.

18  Q    What did the defendant's father tell you?

19  A    Mr. Mowla's father indicated he had recently spoken to

20  his son on the telephone.  He indicated that he appeared to be

21  doing well.  That he had not been taking medication.  And that

22  he was, in his opinion, functioning okay without the

23  medication.

24  Q    So now I want to get finally to the details of the

25  competency evaluation.  Can you explain to us the reasons why

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1    you concluded the defendant was competent to stand trial?

2    A    Mr. Mowla did not exhibit to me any symptoms of acute

3    psychopathology.  I considered both his factual and rational

4    understanding of the proceedings against him, as I would for

5    any defendant, referred for a competency to stand trial

6    evaluation.

7         Regarding his factual understanding, Mr. Mowla's

8    information that he provided appeared to be intact.  He was

9    aware of the nature of his charge.  He also was aware of

10   various definitions regarding courtroom proceedings.  And he

11   was aware of the nature of his being sent to MCC New York.

12        Unfortunately, I was unable to complete the

13   competency to stand trial evaluation on two different

14   interview dates.  The first being because Mr. Mowla said he

15   was experiencing auditory hallucinations and that the

16   questions were upsetting him such that he wanted to return to

17   his housing unit, which he was allowed.  The second time I

18   tried to continue with the competency related questions, that

19   was after the administration of the test we spoke about

20   earlier, the TOMM, where Mr. Mowla did not return to the

21   office.

22        Regarding his rational understanding, I did not have

23   any concerns regarding his ability to coherently and logically

24   assist with counsel, as evidenced by his appropriate

25   communication with counsel over e-mail.  And in addition to

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1  that, there were no observed or reported psychopathology based

2  symptoms by myself or other staff at MCC New York during the

3  evaluation period.

4          THE COURT:  How far did you get with him in terms of

5  the competency exam?  What were you able to complete?

6          THE WITNESS:  It was more definition based where I

7  was asking him basically what his charges is, what an oath is,

8  why he was sent to MCC New York.  I did not get as far as his

9  relationship with his attorney, as well as the plea bargaining

10  process.  However, I did ask him about the various pleas and

11  he did express understanding of those, guilty and not guilty.

12          THE COURT:  Did you ask him about the various roles

13  of different people in the courtroom in terms of the

14  prosecutor, judge?

15          THE WITNESS:  No, I did not get that far.

16          THE COURT:  Was that because the two separate

17  interviews were cut short?

18          THE WITNESS:  Yes.

19          THE COURT:  And the last one, you said he didn't --

20  maybe I missed it -- that the custody officer said he wasn't

21  coming back.  Did he give a reason?  Did you ever find out

22  why?

23          THE WITNESS:  During my administration of the TOMM,

24  Mr. Mowla reported that -- there were various reports -- that

25  he was thirsty, that he wanted water, that he wanted to use

SAMANTHA DIMISA - DIRECT - MR. HEEREN

1  the bathroom, that he had a headache, that he was hearing

2  voices, although I never observed him to be hearing voices,

3  that he felt as if I was forcing him to stay there.  I made it

4  through the first trial of that test, there were two more

5  trials after that that I would have liked to administer.

6  However, given Mr. Mowla's report I did release him from the

7  office temporarily with the hope that he would return; not

8  that I would be able to continue with that test, it would have

9  been spoiled at that point, but the hope that I could continue

10  with the competency-related questions.

11          THE COURT:  And just, the message was he's just not

12  coming back.

13          THE WITNESS:  Right.

14          THE COURT:  Go ahead.

15  BY MR. HEEREN:

16  Q    Were there any instances where the defendant didn't

17  understand a particular legal term or legal concept that you

18  asked him about, and how did -- and what did do you when that

19  happened, and how did he react?

20  A    I believe there was one example.  I would have to refer

21  to my report just so I do not misquote on that.

22  Q    Sure, please do.  Let the record reflect the witness is

23  looking at Government's Exhibit 1.

24  A    Referring to page 16 on the top of my report, when I

25  asked him the definition of a plea and the pleas available to

SAMANTHA DIMISA – DIRECT – MR. HEEREN

1    defendants in court, Mr. Mowla responded, quote:  I never

2    heard of the word plea.  I never heard of Indictment or

3    complaint.  But now know a complaint is something they can

4    hold you with.

5              So he did respond appropriately when I would talk to

6    him about various definitions, although I did not get very far

7    when asking him those questions.

8    Q    After the defendant told you he didn't understand or had

9    never heard the word plea, did you provide him with a

10   definition as you understood it?

11   A    I believe that was him spontaneously reporting what he

12   remembered to be the word plea.

13   Q    So when, I'm looking at the first full paragraph on page

14   16, Mr. Mowla further:  I just know that if you break the law

15   and you go to court and they choose guilty or not guilty.

16   That in your opinion indicated that he eventually on prompting

17   was able to define the term?

18   A    Yes.

19   Q    As a more general matter, when the defendant didn't

20   understand something, was he able to express, did he express

21   to you when he didn't understand something?

22   A    Yes, he did.

23   Q    When you attempted to correct his understanding or help

24   him with his understanding, did he appear to be able to then

25   observe that new information and understand the concept?

37

SAMANTHA DIMISA – CROSS – MR. ZISSOU

1   A    Yes.  For example, I referred to the affidavit in support

2   of arrest when he indicated that he was unsure about something

3   related to the charge.  I did read it to him.  And then I

4   subsequently asked him his opinion as to whether the charge

5   against him is a serious one.  And with the information I

6   provided him, he was able to offer an opinion.  He did seem to

7   express an understanding.

8            MR. HEEREN:  One moment, your Honor.  At this time

9   the Government has no further questions for the witness.

10           THE COURT:  Cross-examination.

11  CROSS-EXAMINATION

12  BY MR. ZISSOU:

13  Q    Dr. DiMisa, let me see if I get straight to the point, is

14  it your testimony that you did not have enough time to conduct

15  a complete and thorough evaluation?

16  A    No.

17  Q    Do you think your conclusions would change if you had

18  another ten or 20 hours to observe Mr. Mowla?

19  A    In the event that the defendant presented with any psych

20  pathology during that time, perhaps.  But the amount of time

21  that I had with him, I am confident with the opinion I

22  offered.

23  Q    So the fact that he didn't come back for any interviews,

24  or he left without completing a test, or that you only had

25  three hours, that in no way undermines anything that you've

SAMANTHA DIMISA – CROSS – MR. ZISSOU

1  said here today; is that right?

2  A     No, it does not.

3  Q     And it's not like you're hedging your opinion that he is

4  competent, you're absolutely confident in it, right?

5  A     Yes, I am.

6  Q     And insofar as the diagnosis that he was malingering, are

7  you equally confident in that?

8  A     Yes, I am, as a rule-out diagnosis.

9  Q     When you say rule-out diagnosis, tell us again what you

10  mean by that?

11  A     Where there is a potential lack of diagnostic certainty

12  or inconsistency in data, such as what I mentioned before

13  regarding the mental health records that I was provided from

14  NYU hospital indicative of a history of a diagnosis of

15  schizophrenia, as well as treatment with psychotropic

16  medication.

17  Q     So folks who have schizophrenia often do not present with

18  having schizophrenia, am I right about that?

19  A     I don't understand your question.

20  Q     In other words, just because somebody has -- is it

21  currently -- isn't currently exhibiting the symptoms of

22  schizophrenia doesn't mean they don't have a mental disease or

23  disorder; is that right?

24  A     I would say with a diagnosis such as schizophrenia, it

25  typically has to be treated with an anti-psychotic.  It's not

SAMANTHA DIMISA – CROSS – MR. ZISSOU

1   typical for symptoms to remit on their own.

2   Q    The fact that Mr. Mowla had a long history at multiple

3   different hospitals over a period of time where the consistent

4   diagnosis was apparently schizophrenia, how do you factor that

5   into your assessment, may I ask?

6   A    I did consider it as a differential diagnosis.  I was

7   particularly cautious in the NYU records.  It does indicate

8   Mr. Mowla was treated with Risperdal 1 milligram titrated with

9   three with good effect.  However, there was some mention of

10  his consistent use of marijuana.  I should mention that when

11  they did the urine toxicology at NYU, it came back negative

12  indicating that there was no substances within his system.

13        Also upon admission, I should mention, he was first

14  admitted to New York Presbyterian Hospital on February 14,

15  2016.  Upon admission he did not present with any observable

16  auditory hallucinations or visual hallucinations, but as per

17  family he had been more isolative.  He appeared to potentially

18  be experiencing a prodromal phase, which is the initial phase

19  of schizophrenia.

20        He had a decrease in his GPA from 3.6 to 2.2.  He

21  was on academic probation.  And he did report experiencing

22  stress related to his career path and where to do go with his

23  schooling.

24        So I do take into consideration that there is a

25  history of a diagnosis, as well as a history with the

SAMANTHA DIMISA – CROSS – MR. ZISSOU

1  psychotropic medication.  I did take into consideration the

2  fact that he had throughout high school been using marijuana

3  and then increased his usage to daily during his first year in

4  college.

5          Of note, as per his self-report, the last use of

6  marijuana was in January, I believe the first of the year,

7  2016.  As I mentioned he was admitted on February 14, 2016, to

8  New York Presbyterian Hospital then transferred to New York

9  University Hospital on February 17 and discharged on

10  February 25.

11          THE COURT:  What is the significance of the

12  marijuana usage?  Is it related to schizophrenia?

13          THE WITNESS:  With marijuana usage you can see an

14  emergence of psychotic symptoms.  I was careful to take into

15  consideration whether that had any impact on Mr. Mowla.  They

16  did indicate in the NYU records they too were considering

17  whether there was a substance induced or withdrawal-based

18  psychosis.  They ultimately opined that it was not; and that

19  he was suffering from schizophrenia.

20          I do have respect for NYU Hospital, and I completed

21  a rotation.  It could have been possible he was presenting

22  with those symptoms at that time in 2016, but they were not

23  observable to me during my evaluation.

24  Q    In other words, they weren't simply -- because they were

25  not observable to you, doesn't mean that the previous

SAMANTHA DIMISA – CROSS – MR. ZISSOU

1  diagnosis were incorrect, is that your testimony?

2  A    Certainly.

3  Q    As far as marijuana is concerned, you're aware that

4  marijuana use or heavy marijuana use in teens, late teens, can

5  bring on psychotic symptoms, you're aware of the studies?

6  A    Yes.

7  Q    That is something you learned by reviewing the medical

8  records that were submitted to you, am I right?

9  A    I learned -- can you complete that?

10  Q    That's something that you found out about when you were

11  provided with the medical records from NYU?

12  A    I found out that they were offering an opinion, it was

13  not related to drug use and his urine toxicology was negative.

14  Q    But you did not rely on --

15        THE COURT:  We need to take a quick break.

16        (Continued on the next page.)

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1              (Sidebar conference.)

2              THE COURT:  Here's my question, why don't they just

3    finish the competency, isn't that the best way?  We really

4    should do that, otherwise -- maybe he's a faker, I don't know.

5    But it seems to me, you should at least finish the exam.  If

6    he refuses to, we can keep going on with this, but it doesn't

7    make sense to me.  That's it.  Not just because of my weakened

8    condition, but I really do think that you should at least try.

9              MR. HEEREN:  When you say the competency exam?

10             THE COURT:  She said she didn't finish it.

11             MR. HEEREN:  The interview portion of the competency

12   questions?

13             THE COURT:  Dot our i's and cross our t's.  I mean,

14   the e-mails, things like that, give you a sense that maybe

15   he's better off than some defendants that we have.  But there

16   is a big gap in the record where she says she couldn't finish

17   the competency exam, then if I find him competent, Second

18   Circuit might not agree with that.

19             MR. HEEREN:  Okay.

20             THE COURT:  Sometimes they take exception to things.

21   My suggestion is that we put this off, finish if we can.  Do

22   you want me to instruct him that he should cooperate with

23   them?  Because do you whatever you want, I don't like to

24   interfere with these, with the relationship you have with him.

25   But obviously if he refuses to cooperate again that's

SIDEBAR CONFERENCE

1   something that might be to his benefit.  It's in his interest

2   to cooperate.

3          Do you have a problem with me saying it?

4          MR. ZISSOU:  I don't actually.  Here is my concern,

5   I think your point is well taken, I suspect the parties will

6   embrace it.  My concern is Dr. DiMisa has already said nothing

7   is going to change her opinion, so.

8          MR. HEEREN:  Well, that's not what she said.

9          MR. ZISSOU:  What did she say?

10         MR. HEEREN:  She said other facts, if there were

11  other facts and things that were diagnoseable that changed her

12  opinion, she would change her opinion.

13         MR. ZISSOU:  If the Court is not concerned about any

14  of Dr. DiMisa's answers insofar of her willingness to perform

15  a continuing examination professionally, I certainly have no

16  objection.  My only concern is it sounded like despite the

17  fact that she was saying she didn't have enough time, nothing

18  would change her opinion.

19         MS. LEE:  She wasn't saying that she didn't have

20  enough time.  I don't think she would have issued her opinion,

21  she made it clear, if she didn't feel she had enough facts in

22  the tests she did complete and the interviews that she did

23  complete.

24         We fully understand the Court wanting to see if we

25  can make one more effort to get him to complete.  Her point of

SIDEBAR CONFERENCE

1  that is it is not a single factor, she had enough factors, all

2  the things she testified to.

3          MR. ZISSOU:  I'm not going to argue the merits.

4          THE COURT:  I've done enough of these things to know

5  how they work, but I do think that it's a serious enough

6  question that maybe there was something troubling him that

7  day.  I read the report and looked at the record, I don't

8  think it's an unreasonable conclusion to make.  But I do think

9  because the issue is so important that we ought to give it

10  another try and maybe you want to use the same person, maybe

11  you don't, that's not for me to say.  But I do think that in

12  the interest of fairness, really make sure we've got as full a

13  record as possible, I'd be more comfortable making a decision

14  with all the information that I can get.

15          MR. ZISSOU:  I have no objection to that.

16          THE COURT:  I think that's what we'll do.  How long

17  do you think that will take?

18          MR. HEEREN:  I suspect that it may require us to

19  request another order from you.

20          THE COURT:  I'll sign it.

21          MR. HEEREN:  So I think it would be the same 30

22  days, with the caveat that this time it's on the BOP to make

23  the call.  If they conclude for whatever reason it's better to

24  do a second one at another facility, that may impact things.

25          MR. ZISSOU:  Look my better judgment was to let this

SIDEBAR CONFERENCE

1  proceed, but this time I think I have to be present when she

2  conducts his interviews, it might be helpful.  There was one

3  time which she e-mailed me to ask me for help in getting him

4  to attend.  I spoke to him.  I said, look, it's not Goldsmith,

5  she's the one that has to do this.  Then he started to attend.

6  I don't recall hearing post that there was any of the lack of

7  cooperation.  This time I think it's better if I'm there.

8           THE COURT:  Sounds good.

9           MR. ZISSOU:  I think the statute doesn't prohibit

10 me.

11          THE COURT:  I know for state-wise we can go.  I

12 can't direct competency.  Competency in state is usually down

13 at Kirby.  I don't recall, defense counsel.

14          MR. ZISSOU:  My wife was there for a week with her

15 client.

16          THE COURT:  In terms of the mental disease or

17 defect, I think it's routine for defense counsel to be there.

18 It makes sense if you want to be there for the competency

19 thing too.  I think that makes sense.  I'll just tell him what

20 we're going to do and we'll adjourn it for 30 days.  You'll

21 let me know if you need more time, we'll adjourn it for 45.

22          MS. LEE:  I think it's 30, assuming he goes back to

23 the facility he has to be retransferred, it's 30 days to

24 conduct it if they start again and then another time.

25          THE COURT:  You want to do 60?  Is that okay with

SIDEBAR CONFERENCE

1    you?

2              MR. ZISSOU:  Yes.

3              THE COURT:  Then they can accommodate your schedule

4    as well.

5              (End of sidebar conference.)

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          (In open court.)

2          THE COURT:  Having had a chance to think about some

3     of these things, it seems to me that under the circumstances,

4     we talked about this at the side with counsel, that really the

5     appropriate thing to do, to make sure the record is complete,

6     is to make an attempt to finish the entire competency

7     examination so that I have a complete record on which to make

8     that decision.

9          I have read the report by the doctor, Mr. Mowla.  It

10    is in your interest to participate in this examination.  When

11    the doctor wants to interview you, you need to go and

12    interview with her.  It doesn't help you if you refuse to

13    participate in it.  It doesn't.  It's not a helpful factor if

14    the person who is being examined won't permit the doctor to

15    examine.  It's something that you should participate in.  You

16    can certainly talk to your lawyer about that.

17         I do think that under the circumstances, just so our

18    record is complete, so I have all the information that I need

19    to make a decision that's fair to both sides, I would like to

20    see that process completed.  So I'm going to adjourn the case

21    for 60 days.  I know that the Bureau of Prisons needs at least

22    30 to do one of these examinations, and then I know that

23    defense counsel is going to arrange to try to be present for

24    at least a portion of it; is that right?

25         MR. ZISSOU:  Yes, your Honor.

PROCEEDINGS

1          THE COURT:  And so we discussed at the side 60 days

2     is probably a time that will work.

3          We're on trial in June, but we could see everybody

4     at 4:30 on June 26 -- let me think about this.  I have a trial

5     on, I'm 99 percent sure it's not going to go, let's say

6     2:00 o'clock on that day, June 26.  Does that work for

7     everybody?

8          MR. ZISSOU:  It does.

9          MR. HEEREN:  Yes, your Honor.  Obviously to the

10     extent there is any -- we'll check with the witness or if

11     there is a new doctor.

12          THE COURT:  You'll let me know.

13          I do want to thank the Doctor for her time.  Thank

14     you so much.

15          MR. HEEREN:  Your Honor, the one other thing I

16     wanted to clarify for the record when you said, and we

17     discussed this at sidebar, when you say that the competency

18     examination wasn't completed, the testimony today I believe

19     was that her competency evaluation, her opinion, was

20     completed.  Part of that was that certain aspects of the

21     examination were not finished because the defendant did not

22     arrive.

23          THE COURT:  That's what I'm talking about.  I'm just

24     talking about there were certain things that she was unable to

25     complete because the defendant refused to participate.  So I

PROCEEDINGS

1   think we should remedy that.

2          I'm not saying one thing or the other.  I'm not

3   saying anything about her ultimate conclusion at all.

4          Anything else?

5          MR. ZISSOU:  No, your Honor.

6          MR. HEEREN:  Thank you, your Honor.

7          THE COURT:  I want to thank the Marshals also.

8          (Whereupon, the matter was concluded.)

9                *     *     *     *     *

10  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

11

12

    Rivka Teich, CSR RPR RMR FCRR
13  Official Court Reporter
    Eastern District of New York

14

15

16

17

18

19

20

21

22

23

24

25

1    SAMANTHA DIMISA

2

     DIRECT EXAMINATION     BY MR. HEEREN        5

3

     VOIR DIRE              BY MR. ZISSOU       11

4

     DIRECT EXAMINATION     BY MR. HEEREN       16

5

     CROSS-EXAMINATION      BY MR. ZISSOU       39

6

7

8                          I N D E X

9                          EXHIBITS

10   GOVERNMENT                 PAGE
     1                          21

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25